**KATRINA MAY SCIASCIA, Guardian ad Litem
for SHARLEA KIMIORANGA, Plaintiffs**

**v.**

**SHERRY LUTALI and WILLIE LUTALI, Defendants**

High Court of American Samoa
Trial Division

CA No. 144-91

November 13, 1992

Before RICHMOND, Associate Justice, TAUANU'U, Chief Associate Judge, MAILO, Associate Judge.

Counsel:      For Plaintiffs, Charles V, Ala'ilima
              For Defendants, Togiola T.A. Tulafono

This action seeks damages for personal injuries sustained in a motor-vehicle accident. Trial was held on August 6, 1992.

## FINDINGS OF FACT

### A. *The Accident*

This accident involved the collision of a pickup truck and a pedestrian. It occurred during daylight hours in the early afternoon of August 28, 1991, on the public highway adjacent to the Kym residence in the Village of Pava'ia'i, American Samoa. At the time of the accident, the vehicle was owned by defendants Sherry Lutali ("Sherry") and Willie Lutali ("Willie"), who are married to each other, and was operated without liability-insurance coverage. Hence, no action was filed against an insurer. Sherry was driving the pickup. The pedestrian was plaintiff Sharlea Kimioranga Jasmin Sciascia ("Sharlea"), who was then nine years old.

Shortly before the accident occurred, Sharlea and her brother Israel, who is 13 years of age, had crossed the highway from the Kym house, located on the ocean side of the road, to return to their home in Aoloau on the mountain side of the road. They had been at the Kym house with the Kym children during the course of the day. Helen Kym, who is 14 years old, reminded Sharlea that she had forgotten to take her sleeping bag. As Sharlea was about to return to the Kym residence, a westbound bus stopped or was stopping to her left. The driver waved to her to cross the road, saying something which Sharlea understood to mean she should go ahead. An eastbound bus was stopped across from Sharlea at the oceanside edge of the road. The pickup driven by Sherry was approaching from the west in the eastbound lane. Without looking further at immediate traffic conditions and unaware of the pickup, Sharlea started running, at a jogging rate, diagonally across the road towards the Kym house. She slowed down, perhaps to a walk, as she entered the eastbound lane. She suddenly became aware of Sherry's pickup, raised her right hand signaling and shouted to stop, but she and the pickup momentarily collided.

39

Sherry, who was 23 years old at the time of the accident, was accompanied in the pickup only by her young son. She did not see any buses or other vehicles on either side of the road at or near the accident scene. She knew and waved at Helen, which Helen confirmed. Sherry believed that the speed of the pickup was approximately 20 miles per hour. From her perspective, Sharlea darted across the road and was almost to the middle of the road, about 20 feet ahead of the pickup, when Sherry realized the danger in the situation. Sharlea, still running, raised her hand and shouted to stop. Sherry braked and swerved to avoid Sharlea, but Sharlea and the pickup collided. The impact point on the pickup was near the side-view mirror on the left door.

At this point, we note that four eyewitnesses at different locations testified to the events of the accident. There were some discrepancies in their respective versions of these events. However, their testimonies were remarkably similar with respect to the key circumstances, and except for further comment below on the presence or absence of buses, these differences do not affect our findings.

B. *Liability*

Turning to analysis of the events of the accident on the issue of liability, we take judicial notice of several facts to assist in evaluating both the speed of the pickup when Sherry became aware of the danger presented by Sharlea's presence on the road and any negligence by Sherry due to violation of the speed limit prescribed by A.S.C.A. § 22.0323. First, we will use the factual information on stopping distances for a single-unit vehicle, with a gross weight rating of less than 10,000 pounds, contained in the *Uniform Table on Driver Stopping Distances, Including Perception-Reaction Distance*, 10 P.O.F. App., Fig. 21 (1961).[1] Second, we recognize that at a speed of 20 miles per hour, a vehicle travels 29.33 feet per second. Third, we note that several signs, erected by the Commissioner of Public Safety, on both sides of the road within the Village of Pava'ia'i, give notice of a maximum speed of 25 miles per hour.

The *Uniform Table* indicates that the driver stopping distance for a pickup traveling at 20 miles per hour is 74 feet, including driver

---

[1]    This table was agreed on by ten national traffic safety organizations and was approved by the National Conference on Uniform Stopping Distance Charts.

perception distance of 22 feet, driver reaction distance of 22 feet, and vehicle stopping distance of 30 feet. At 25 miles per hour, the total stopping distance is 98 feet, including driver perception distance of 28 feet, driver reaction distance of 28 feet, and vehicle stopping distance of 42 feet. Since the impact occurred almost immediately after Sherry became aware of the dangerous situation, we find that the pickup and Sharlea were approximately 20 to 30 feet apart when Sherry became aware of the situation; that, within a second later, Sherry started to brake and the impact occurred almost simultaneously; and that the speed of the pickup when Sherry began to perceive the danger was approximately 20 to 25 miles per hour. We further find that Sherry was not negligent due to any violation of the maximum speed limit prescribed by A.S.C.A. § 22.0323.

We are convinced, however, that Sherry was negligent in failing to notice the precarious situation and in not taking defensive action any sooner than she did. She was aware of the group of children along the road when she waved at Helen. However, she did not observe the two buses that were stopped or stopping on each side of the road.[2] She did not grasp the need to reduce the speed of the pickup until it was too late to avoid the accident. Sherry's inattentiveness to the full circumstances of the situation establishes a lack of ordinary or reasonable care, which persons of ordinary prudence would use to avoid foreseeable injuries to children who are nine years of age.

---

[2] Of the four eyewitnesses, Sharlea was the only one who recalled seeing both buses. Helen, who was on the mountain side of the road when the accident occurred, noticed only the westbound bus. Neither Sherry nor Mrs. Tuitele, who was picking up trash in her yard next door to the Kym house, observed any buses. However, we do not think that these differences in the witnesses' perceptions indicated a lack of credibility of any of them. We also do not think that the presence or absence of the buses, particularly the eastbound bus, had a direct bearing on the accident in the sense that Sherry had to pay attention to avoid striking any bus. We do think that Mrs. Tuitele, based on her yard activity, and Helen, perhaps based on her recognition of Sherry's greeting, were not necessarily alert to every circumstance immediately before the impact. Moreover, while Sherry's failure to notice the eastbound bus further illustrates her lack of awareness, we think that even if there were no eastbound bus, her inadequate attention to the situation was amply shown.

41

Persons dealing with children must anticipate the ordinary behavior of children, taking into account their maturity, intelligence and experience. The fact that children usually do not exercise the same degree of prudence for their own safety as adults--that they often are thoughtless and impulsive--imposes on those dealing with children, and from whose conduct injury to a child might result, a duty to exercise proportional vigilance and caution. *Schwartz v. Helms Bakery Ltd.*, 67 Cal. 2d 232, 240, 60 Cal. Rptr. 510, 515, 430 P.2d 68, 73-74 (1967). Statutory descriptions of this standard of care are found in A.S.C.A. § 22.0701, defining careless driving, and A.S.C.A. § 22.0406, prescribing a driver's overriding duties to pedestrians, especially children. Sherry's negligent operation of the pickup was clearly a proximate cause of the accident and Sharlea's injuries.

At the same time, it is clear that Sharlea's conduct was also negligent and that her negligence was a contributory cause of the accident and her injuries. Sharlea crossed the road into the unavoidable path of Sherry's vehicle, at least at the time when Sherry belatedly perceived Sharlea's presence. Also, because Sharlea crossed the road at a point other than within a designated, marked or unmarked crosswalk, she was required to yield the right-of-way to all vehicles. These are standards of conduct set forth in A.S.C.A. §§ 22.0401(c) and (d).

Thus, it becomes necessary to compare the respective negligent conduct by Sherry and Sharlea and to diminish the award of damages in proportion to the amount of negligence attributable to Sharlea. A.S.C.A. § 43.5101. Apportioning their negligence, we find that each is equally culpable. On one hand, Sherry failed to keep a proper lookout when she knew or should have known of the risk to children in the area. On the other hand, Sharlea could have readily avoided the dangerous situation in which she found herself. Therefore, we assess Sherry's responsibility at 60% of the damages suffered by Sharlea.

Based on Willie's joint ownership with Sherry of the pickup and their marital relationship, we further find that Sherry was operating the vehicle at the time of the accident with Willie's express or implied knowledge and consent. *See Wilcox v. Berry*, 32 Cal. 2d 189, 195 P.2d 414, 415 (1948). Therefore, Sherry's negligence is imputed to Willie, and he is equally responsible with Sherry to the extent of her liability to Sharlea. *See Foma'i v. Semana*, 4 A.S.R.2d 102, 104-109 (1987); *Toleafoa v. Sioka*, 5 A.S.R.2d 18, 21 (1987); *Sataua v. Himphill*, 5 A.S.R.2d 61,63 (1987); A.S.C.A. § 22.2003(2).

42

C. *Damages*

After the impact, the pickup quickly stopped, partially off the ocean side of the road. Sherry thought that she stopped almost immediately and that the pickup did not drag Sharlea. However, based on the *Uniform Table* information for a single-unit vehicle, with a gross weight rating of less than 10,000 pounds, moving at 20 to 25 miles per hour, it is apparent that Sharlea was dragged some 52 to 70 feet before the vehicle came to a complete stop. That Sharlea was dragged for some significant distance is also consistent with the nature of her injuries, described below.

After the collision, Sharlea was taken to the hospital by her uncle. She next recalled being held by a friend of her uncle in the cab of her uncle's pickup. She was not sure whether or not she had been unconscious. She saw blood and the skin removed from her right foot. She was in severe pain which she had never experienced before. She did not remember arriving at the hospital or exactly what initially happened there. She did recall that at some point, she was in a room with people moving around. She then felt dizzy and great pain. There was a cast on her right leg when she next woke up. She did not recall the length of time that she was hospitalized. Back at home, her mother dressed her foot more than once a day. She did not attend school for a while, but she was not sure of the length of her absence. Her leg was checked by doctors from time to time. She is now used to the sight of her foot. She can do the same things now that she did before the accident, but she feels pain on the bottom of her foot when running. Today she can wear shoes and walk straight, but differently, with an up and down "bump." Her friends had called the sight of her foot gross, but this description does not bother her any longer.

Katrina May Sciascia, Sharlea's mother, first saw her daughter about two hours after the accident. A neighbor took her to the hospital. Sharlea was then crying in pain, calling for her mother. It was about three to four hours after the accident before a doctor was available to care for Sharlea, and it was about five hours before she was sedated. Sharlea was hospitalized for about one month. After Sharlea was released, her mother tended to her wounds twice a day. For a while, Sharlea was confined to a wheelchair and was emotionally depressed. However, her mother has encouraged her daughter to lead a normal life. Her mother thinks Sharlea can now do most of the things she did before the accident. Sharlea started playing basketball, a game she loves, about

43

a month ago, but she cannot play a whole game. Sharlea also walks as though she needs to constantly balance herself.

Dr. Ronald W. Vinyard, an orthopedic surgeon, first saw Sharlea on the day of the accident at the request of Dr. Reilly Magiin, who wanted a second opinion on her condition. Sharlea was conscious and reasonably stable, in shock but not grossly so. She had suffered a compound fracture of her right leg between the ankle and knee. Two bones protruded. The tissue along the inside of her right foot was torn away from her ankle to the toes. She also had facial abrasions and contusions, which were not serious injuries. Under anesthesia, her leg and foot were debrided of dead tissue and irrigated, and the foot wound was dressed. Then the leg bones were reduced to normal alignment, and a cast to the toes was placed on the leg. The foot part of the cast was removed three days later to treat the foot further by grafting skin from other parts of her leg to granulated foot tissue, placed at measured intervals to grow together. This procedure is done under general anesthesia and, at the donor site, involves acute pain for two to three days and takes ten days to three weeks of healing time, depending on the thickness of the removed skin. The grafts are then regularly watched for the growth and viability of the grafted skin. Treatment also included medication for pain and antibiotics for infections.

Dr. Vinyard also testified that, according to the medical records, Sharlea was actually hospitalized from August 28 to September 20, 1991, and has regularly received outpatient treatment since her release. She was last treated on April 8, 1992, and another treatment was scheduled about three months later. Dr. Vinyard examined Sharlea the week before the trial. The grafting process is still incomplete, as there is still exposed granulated tissue. In time, the foot will be frozen and superficial skin ground off in preparation of new grafts, perhaps done in a series, as may be necessary. The foot functions mechanically well now, but it will never be completely normal. Sharlea can expect to participate in sports, probably on a somewhat restricted basis. The foot will continue to require superficial skin care on a regular basis. Sharlea is also a candidate for early arthritis due to this injury. She also has four to five years of normal bone growth ahead of her, and a "club foot" may develop. She should be seen every six months until her normal growth period is over.

Her foot will never look like it did originally. Regardless of the success of the healing or growth processes, Sharlea will eventually require additional cosmetic surgery, at best, and "club foot" corrective

surgery, at worst. Special instruments, which are presently unavailable locally, are needed for these kinds of surgery. The current cost of each such operation in the U.S. mainland is about $5,000. Three cosmetic operations will probably be necessary to make the foot appear as normal as possible. Five to 12 operations may be required if more severe conditions are encountered.

In determining special damages for medical expenses, we first note that although it is apparent that some current medical expenses were associated with both Sharlea's inpatient and outpatient care, the record evidence is not specific on incurred medical expenses. However, since Sharlea is not entitled to medical attention under A.S.C.A. § 13.0601, lawful charges were $60 per day for inpatient care under A.S.A.C. § 11.0302(b)(1) and $2 per visit for outpatient care under A.S.A.C. § 11.0302(b)(1). Thus, by reason of Sharlea's hospitalization for 24 days, her inpatient medical expenses would have been $1,440. Again, we do not know the exact frequency of her regular outpatient checkups after her release in September 1992 through April 1992, but given the nature of her injuries, a reasonable estimate is three times a month, resulting in outpatient charges of $42. Therefore, we find that Sharlea's past medical expenses were $1,482.

Damages for projected medical expenses are allowed when, as has been shown in this case, permanent and troublesome injuries will probably require medical treatment in the future. *Besch v. Triplett*, 532 P.2d 876, 877-878 (Ariz. App. 1969). Additional skin grafts, locally performed in a series, are reasonably certain. We think that the equivalent of 12 inpatient days, costing $720, is a reasonable estimate for this medical expense. There is also reasonable probability or certainty of at least three cosmetic operations, estimated at $5,000 each by today's cost standards, or a total of $15,000. Finally, the recommended outpatient checkups to be conducted at six month intervals for the next five years, if they are done in American Samoa, will add another $20 to the projected medical costs. Therefore, we find that Sharlea's projected medical costs are $15,740. Combining these determinations of past and future medical expenses, special damages for medical expenses are $17,222.

Clearly, Sharlea suffered and in the future will suffer substantial pain and suffering, including but not limited to the effects of lifelong disfigurement and some permanent disability. Taking into account typical awards for pain and suffering in American Samoa, and recognizing that any dollar value for this purpose is objectively neither right nor wrong,

45

we find that Sharlea's general damages for pain and suffering are $50,000.

Apportioning the total damages of $67,222 on a 60%-40% basis according to our comparative negligence evaluation, we find that Sharlea is entitled to $40,333.20 in damages.

## CONCLUSIONS OF LAW

1. Sherry negligently operated a motor vehicle on the occasion of this accident, and her negligence was one proximate cause of Sharlea's personal injuries.

2. Sharlea negligently crossed the road, and her negligence was the other proximate cause of her injuries.

3. Comparing the negligent conduct by Sherry and Sharlea, assessment of responsibility at 60% to Sherry and 40% to Sharlea is reasonable.

4. Sherry's negligence is properly imputed to Willie to the full extent of her liability to Sharlea.

5. Sharlea's special damages for medical expenses are $17,222. Her general damages for pain and suffering, including disfigurement and permanent disability, are $50,000. Her total damages are $67,222.

6. Apportioning the damages on a 60%-40% basis between Sherry and Sharlea, Sherry and Willie are jointly and severally liable to Sharlea in the sum of $40,333.20.

7. In accordance with *Judicial Memorandum No. 1-1988*, 7 A.S.R.2d 144 (1988), until further order of the court, the amount of the damages shall be deposited directly into the depositary of the High Court of American Samoa and shall be placed in an interest-bearing account with Sharlea as the beneficiary. Disbursements will be made only on application by Katrina May Sciascia as guardian *ad litem*, or by her successor of record, and only on approval by one of the justices.

Judgment shall enter accordingly. It is so ordered.